Is number 25 to 534 Have a good day. Good morning, Your Honors, and may it please the Court. In NAACP v. Alabama et al., X. Roe Patterson, the Supreme Court held that state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny, and in this Court's decision enrolled in 2013, the Court indicated, quote, labor unions are well within this protection. In my view, this case is a simple case and should never have been dismissed. Here, Judge Karras indicated that he believed that the proper analysis of a First Amendment association case involving a union and punishment for union membership had to do more with speech analysis than it did with what I believe to be clearly established associational law from Rowland on. And Rowland, of course, itself depends on Supreme Court precedent, namely Brotherhood of Railroad Trainmen v. Virginia, which was decided in 1964 by the Supreme Court. Just to state it very simply, and obviously I'll answer whatever questions the Court has, my client was a labor leader. He was a person who was on the board. He was very involved in both grievance and collective bargaining negotiations. That's stated amply in the First Amendment complaint. My client was subjected to adverse action, which at this point is not really the subject of dispute. Judge Karras, in his second decision, acknowledges there are adverse action. Causality cannot be at this point determined on a motion to dismiss. Cases which have been cited contrary to those in our briefs. Kennedy, why do you say that last one? In other words, why do you say that causality can't be decided, because we do that all the time? On a motion to dismiss, there's clear allegations as both to temporal proximity here and comparators, and they're in the complaint. So in that context, it's not a summary judgment motion like Cobb was and other cases in which this Court decided that the associational. Alito, how much time allegedly elapsed between the, whether you describe the speech or conduct or the back and forth with the sheriff and the actual adverse action? Essentially, in a way, none, because what happened was he was on 20C status. The sheriff then, once he was on 20C status, determined he shouldn't be anymore. There was a hearing held. The hearing decision came down. My client was ordered back to work. The sheriff would not allow him back to work. The sheriff then put him on AWOL. The sheriff then deprived him of salary and medical benefits. My client then brought another note in. He was on then-worker comp for a period of time, having the adverse actions already taken, and then the retirement badge was denied. These are all part of a sequence of events, Your Honor, and I don't think that the temporal proximity issue is even pertinent. I mean, there are cases in this Court which have had 11 months, 21 months, and the basic rule has been, when you have the opportunity, if you retaliate, that that's sufficient. And he had the opportunity presented itself, and the gentleman retaliated. But my fundamental point is that this case is critical, because what is occurring is post-Roland, there is a lack of recognition that a union leader cannot be retaliated against for his active participation in a union, and that is the principle here. The fact that his union activity was about grievances, several of which might have been about him, is not pertinent to that analysis. The analysis is, is he actively engaged in a union, and does the fact allege sufficiently that that is the predicate of the retaliation, which it does. It says...  When was, according to the complaint, when was the last time of active association with the union?  2021, Your Honor. Breyer. 2021, and he was on the executive board, and he was involved in the grievance process, 2020-21. Before I, he was on that until he went out. He went out at the point where he was badgered in this, beaten in this incident, he then was out. And it was upon his going out that the...  So what I see is paragraph 25, in or about 2020, in his union leadership role, plaintiff participated in the union's decision to oppose the sheriff, and so on. As a consequence of the plaintiff's union membership and involvement, that is, in or about 2020 and before that, defendant Falco bore a grudge. And then there's the assault, assault, 29, plaintiff continued to be afflicted with work-related injuries. So I think what I see is 2020 is the union activity, and prior to that... There were, there are a series of grievances which I believe are dated into 2020 and early 2021, but he still was in the executive role, Your Honor, with the union at that point. His union association hadn't desisted in any form. But his complaint is premised upon his position as a union representative on particular issues of interest public, of interest to public. So it sounds more like a Pickering-style claim than it does a Roland-style claim. Oh, I, this is where we get into this question. The way I understand it, and I believe the way the complaint, the second complaint is drafted, the question was his union association. We did get into the content of it to demonstrate the nature of the union association. Because it's obvious that an individual can't simply say, I'm a member of a union, and you can't discipline me because I'm a member of a union. That doesn't get us anywhere. It's like saying under Title VII...  It did in Roland because... Because that was the nature of the... Because Roland fired people in retribution for the State and labor unions not agreeing to the contract terms. So the point is, that's a case of very direct evidence where that kind of causality is demonstrated. I respect that. But normally, either in Title VII or in this kind of First Amendment litigation, the membership in the group is not sufficient. There has to be some indicia that the membership invoked the retaliation. We believe that is fled in this case. There is that indicia. And Judge O'Hare was reading from the complaint. The complaint does indicate that the sheriff directly responded to the union activity of my client, specifically to my client. And that's where I think this is different from simply you're a union member. It's more, you have to be more than a union member to claim an associational right. But here, when you're a union leader, it goes to the core of what Roland announces and reannounces, affirms, that you cannot be retaliated against for that kind of activity. And that's what we claim happened here. And if that's what happened here, it's plainly unconstitutional. And that's the central piece of our argument. The nature of the advocacy is explained or explicated simply to give an understanding that this is not simply a person who's in the union. That's not enough. I'm not arguing that it's enough. But we've met the threshold of showing sufficient membership and activity to invoke the principles that have been operative since the 1960s, which is there cannot be retaliation or punishment against someone for active union membership. Or it imbalances the labor management structure, particularly in the public sector, in a way that's been deemed unacceptable. And that's what we're dealing with here. So it's the fact that it's not what he said as a union member. It's what he, it's the fact, solely the fact of his membership. His leadership, not his membership. Membership. All right. Leadership. Leadership. But I think it's a critical distinction. It's like saying a person who comes to court and is female and says under Title VII, and they did this to me, I'm female, we know that's not enough. There has to be indicia that that gender played a role in somehow in the decision. The same thing is true here. The indicia here that the First Amendment was violated was the hostility directed toward him because of his union activity. And that's what's pled in the complaint. Sorry my time's up. I have reserved some time. Thank you. Good morning, Your Honors. May it please the Court, Robert Weissman, Suresky, Kass, Dranoff, Weissman, Maynard. For the defendants, Appellees, the County of Rockland, and Sheriff Falco. The District Court's opinion should be affirmed. What Plaintiff is trying to do here is literally what Garcetti forbid, which is to constitutionalize the employee grievance. Regardless of the fact that the amended complaint tried to rephrase the claim, the underlying facts are the same as in the original complaint. This is a hybrid speech association claim. The actions all deal with speech, filing grievances, acting in plaintiff's words as a spokesperson, and the issue, of course, in 2015 with supporting the Sheriff's opponent. Therefore, he has to show that he was acting as a citizen on a matter of public concern, and he has not plausibly pled that. Setting aside the things that are clearly undeniably personal to him, the use of his sick time, the note in his file, and things that, like the officers McGuigan and Motters' claims regarding their schedules that under no conceivable situation could ever be a public concern, we have issues like the drug testing, which is not some great public debate about whether drug testing is wise or appropriate or necessary. It's a complaint that one of the tests was done a few weeks too early, and so you had two of them in the span of three months instead of one. And the officers are asking to be excused from the next one. The test being held a few weeks early is clearly not a matter of public concern. There's no social import to it. There's no newsworthiness. And similarly, regarding the body cameras, nobody is contacting their congressperson. What Mr. Sussman says for our use, as I understood it, is that to us, this is really a First Amendment retaliation case not subject to pickering. And the only reason when we read, as we should, his complaint liberally, the only reason we're in favor of his client, the only reason that you've got these allegations relating to what he said, in particular to Sheriff Falco, is to show that he is, in fact, a leader. Because otherwise, we might say, well, you haven't shown enough or you haven't adequately alleged that he's had, he had some leadership role or played some leadership role in the union. So let's just say that we would agree with him on that, that we should view this as a sort of a pure, as opposed to a hybrid, First Amendment claim. Then what is your argument? In that case, Your Honor, the case law is still clear that association cases require a matter of public concern. You may not have, in terms of pickering, the speech as a citizen, but nonetheless, Cobb, Augusto, Lynch are all clear that you have to have a matter of public concern. And clearly, the activities that he was involved in. Well, that seems to go back to the hybrid model. And what I'm asking is, if you set aside the hybrid model, that analysis of the pickering, and you view it as more of a Roland type of case where it's really about union membership, with the indicia of union membership that are alleged in this complaint, then, you know, for example, I'd ask about causation. What's your position on that? Certainly. I think that causation, it's very clear that contrary to what Mr. Sussman indicated, this was not the first time that the sheriff could have retaliated. The last time that Mr. Lopez served on the union board was in 2020, not in 2021. And certainly, if the sheriff had any desire to retaliate, he could have done so in 2019. In 2020, when he was on, Mr. Lopez was on the board, he could have done it in the first half of 21 before Mr. Lopez went out on medical leave. And even after he went out on medical leave, he was still employed by the sheriff's department. The sheriff could have denied him his 207C leave initially. He could have cut off his medical benefits. He could have fired him if he wanted to find some reason to do so. Those were all methods that he could have retaliated, but he didn't. We have two to three years between his last service on the CoBARC executive committee and December of 2022, when he was put on AWOL status, and spring of 2023, when he was supposedly denied this retirement badge. If the sheriff was in mind to retaliate, he easily could have done something during those two to three years. And in terms of, you know, support for his opponent, that was 2015. So we're talking seven to eight years earlier. The problem with these cases is, Roland, it's easy to figure out because there's no other, these 2,800 state employees that were like, oh, they didn't say a peep. They just happened to be state employees and the governor was having a tiff with the labor unions over a contract negotiation, so it's easy to figure out. But we, and we struggled with this in CoB, because CoB does introduce the idea of, that it's union status and something else, saying something that's done within the context of union status, and then it has to be of public interest, kind of like the Pickering add-on. And as recent as 2022 in Schara versus Maine Edwards School, that's the school bus driver who was concerned about reporting safety incidents and things. We re-embraced that. I mean, other than, it would be very hard to find an incident where the union members picked out a loan purely by their union membership. It's almost always done in conjunction with something that's a union activity. But what about, what about where he's injured? And then the sheriff tells him to come back to work, and there's a dispute about that. And then there's a hearing, so the sheriff, they go to a hearing on it, and he's ordered to go back to work, and then the sheriff won't let him come to work. Doesn't that seem, I mean, that's not a, that doesn't seem like a labor union, or a, you know, complaining to the public about it. It seems like a change in his, a change in his drips. The sheriff's dripped, and how else to, I mean, is it plausible, or is it, is it a, is it reasonable inference that that change was purely because of animus torts? Because of this individual, because of his union status? I don't believe so, Your Honor. Because, again, if the sheriff wanted to retaliate, he didn't have to grant 207C status at all. In 2021. Yeah, 207C status is a state statute that's with regard to its continuation of benefits, right, as a result of an injury? Yes, but the sheriff has to approve it. There's an application. The sheriff has to sign off. Right. And that does not always happen. It goes for a recommendation. It goes to the sheriff to approve. Right. He didn't have to do that. He did. Okay. So, yes, and I think that the forum of the action is also highly relevant to this in terms of this not being a matter of public concern. Although it's not determinative, this Court has held that the forum can be an indication as to whether something is a matter of public concern or not. In this case, it was filed through the union grievance process up the chain of command. It was not made in any forum where there was a citizen analog. No one's going to the press. No one's going to their congressperson. And, per Cobb, and Shara, and Lynch, and the others, there does need to be a matter of public concern. It's basically about the concern.  All right. Anything further? If the Court has nothing further, thank you. My client was attacked at work and beaten by an inmate. 207C could have been denied, but it would have been immediately overturned because it would have been such an absurd denial. I don't believe there was much discretion involved. I also don't think the record shows that it was the sheriff who granted him 207C. Mr. Weissman's been involved, as I have, in many cases in the county. They have a risk management service in that county which determines 207C. It's not part of the record that the sheriff gave him 207C, and that's not something that could be fairly inferred here on a motion to dismiss. The record has not been developed as to how he got 207C. I don't think that could be viewed as the sheriff's opportunity on this record, Mr. Weissman says that to the Court as if it's an established fact. It clearly is not. Moreover, most importantly, with regard to Sherrer, Your Honor. What's interesting is, do you claim his termination is a violation, part of this violation of status? We did not. We did not claim his termination.  Well, the way it worked is he was not allowed back to work when he would have been able to go back to work. So we certainly claim that is a violation. There's a two-year period under State law after which someone is terminable if they can't come back to work. Section 71. Right. So there's a — again, it gets complicated here. And again, I don't think that — I'm happy to answer that. The complaint indicates he got a psychological note, and based on that note, stayed out of work. That note was honored by the sheriff ultimately, and he was off of his AWOL and restored to the medical benefits. He'd been denied. But I think the fundamental point is Sherrer, the case — But to be clear, he's not claiming that he was terminated as a result of unanimous about — Yes. You're correct. That's not a cause of action in the complaint. But I do want to address the fundamental issue, the First Amendment issue, because the cases which I believe control here, and I think Roland is crucial for this proposition, stand for, and this case, I believe, should stand for, the idea that a person who is subject to disparate treatment, temporal proximity, Your Honor, is one form of evidence. It's not the only form of evidence, as the Court knows. Comparative evidence is also relevant. My client indicates here that there were others who were in the same position he was that's in the complaint who were not treated similarly. That also stands for evidence of intent and causality. So proximate — temporal proximity is not the only causation, even if one agreed that there was no sufficient temporal proximity. You heard your friend. The sheriff had opportunity after opportunity, understanding his union membership, just if I agree with you on the First Amendment analysis, to retaliate. But the point is that's not in the complaint. And to say that he had opportunity after opportunity — I'm not — Sorry. Sorry. Go ahead. Actually, when you say that's not in the complaint, it is. I mean, your obligation — someone's obligation, the plaintiff's obligation — Sure. — is to make the allegations of the complaint that show that there's some connection, some causal connection between what you claim is the retaliatory act and the motive, so to speak, that union membership. And he was aware of this union membership. He was aware of — if we're going to adopt this, that as the framework, well before any retaliatory action — And the complaint clearly says that this gentleman has a history of retaliating against union leaders who were active, more active back then than my client. That's a fact. He has that history. And the complaint alleges that he does. It also indicates that this gentleman made clear his animus toward my client in the context of my client's active union activity. And it indicates that when this gentleman had the opportunity, which, as Judge Wesley said, he finally did have after he ordered my client back, my client came back with a note, then he locked them out of work, that's different from how he treated other employees who were similarly situated. That all demonstrates animus. Thank you. Thank you very much. We'll move to decision number four.